[Cite as *State v. Jenkins*, 2021-Ohio-123.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 109323 |
| v. | : | |
| THOMAS J. JENKINS, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 21, 2021

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-639788-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Jennifer N. McTernan, L.L.C., and Jennifer N. McTernan, *for appellant.*

MARY J. BOYLE, A.J.:

{¶ 1} Defendant-appellant, Thomas Jenkins, appeals his convictions and sentence. He raises two assignments of error for our review:

1. As amended by the Reagan Tokes Act, the Revised Code's sentences for the first[-] and second[-]degree qualifying felonies violates the constitutions of the United States of America and the [state] of Ohio.

2. The trial court found against the manifest weight of the evidence that the defendant-appellant committed the acts alleged in Counts 1, 2, and 4 of the indictment.

{¶ 2} Finding no merit to his appeal, we affirm.

## I. Procedural History and Factual Background

{¶ 3} In May 2019, Jenkins was indicted on four counts: Counts 1 and 2, rape in violation of R.C. 2907.02(A)(2), first-degree felonies; Count 3, felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony with a sexual-motivation specification; and Count 4, domestic violence in violation of R.C. 2919.25(A), a first-degree misdemeanor.

{¶ 4} Jenkins waived his right to a jury trial, and the matter proceeded to the bench in October 2019, where the following evidence was presented.

{¶ 5} L.K. testified that she had known Jenkins for over 20 years and had been in a relationship with him "off and on" for the last three to four years. On the date of the incidents in this case, May 5, 2019, Jenkins was living in L.K.'s house with her and three of her four children from previous relationships.

{¶ 6} L.K. stated that around 2:30 or 3:00 a.m. on May 5, Jenkins woke up L.K. because he was "moving around and cleaning up and stuff" in their bedroom. The two exchanged words, and then L.K. tried to go back to sleep because she did not want to argue. She stated, "And then that's when he came in and started having sex with me." L.K. testified that she told Jenkins she "didn't want to have sex right

now." L.K. stated that she told Jenkins, "I don't want to do this. I don't want to do this. Stop." L.K. said that she was crying because she "felt hurt and small and disrespected."

{¶ 7} L.K. said that when she told Jenkins that she did not want to have sex, he "put his hand around [L.K.'s] neck and was choking [her]" while he was "on top" of her. L.K. testified that while Jenkins choked her, she "couldn't barely even breathe." L.K. was "scared * * * because she wasn't sure if [she] was going to die or not." L.K. stated that Jenkins "stopped * * * [and] then he laid behind [her]" and "started having sex with [her] from the back." L.K. was still crying, and Jenkins "finally stopped." L.K. agreed that she did not tell Jenkins to stop anally penetrating her; she "was just crying" during it.

{¶ 8} L.K. said that during the incidents, Jenkins vaginally and anally penetrated her against her will. Although she did not know how long the acts had lasted, she said that "it went from 3:00 to 5:00 in the morning really fast it seemed like." She said that she did not receive any injuries from Jenkins choking her.

{¶ 9} L.K. testified that after Jenkins stopped penetrating her, he went inside the closet, and she went to the bathroom and called 911. When L.K. came out of the bathroom, Jenkins was "trying to take his stuff * * * out of the house." The police arrived. L.K. spoke to police first. They tried to speak to Jenkins, but "he started * * * arguing and being aggressive with them so they * * * carried him out of the house."

{¶ 10} L.K. testified that her three children were in the house sleeping during the acts and did not wake up while they were happening. L.K. went to the hospital where she received a rape-kit examination.

{¶ 11} On cross-examination, L.K. agreed that she did not have any marks on her neck from the choking or lose consciousness during the choking. She also agreed that she did not have any physical injuries after the vaginal and anal penetration, including no bruising or scarring. She was not surprised that they found Jenkins's DNA in her because she and Jenkins had sex on a regular basis, including on May 4, 2019.

{¶ 12} L.K. further agreed that she did not scream or yell during the acts. She explained that she did not do so because she "didn't want [her children] to wake up." She stated that she "didn't want them to be involved in the situation and see somebody that [had] been in their house hurting their mom." L.K. agreed that when she called 911, she was not yelling or screaming; she just told the 911 operator, "I need help." L.K. further stated that she and Jenkins had anal sex in the past. But L.K. testified that she has had long-term anxiety since the rapes.

{¶ 13} L.K. further testified that Jenkins had raped her in the past, but she did not call the police. She stated that she did not do so because she did not "want to break up with him." She had just hoped that he would not rape her a second time. She stated that she called the police this time because she was scared that "one day it's going to be the day when I really don't make it," and she "just wanted him to get some help."

{¶ 14} Jennifer Jacobs testified that she is a sexual assault nurse examiner at MetroHealth Medical Center. She examined L.K. for sexual assault on May 5, 2019. As part of the standard rape kit, she conducted a full assessment and collected swabs for DNA testing.

{¶ 15} Jacobs stated that L.K. gave a narrative of what occurred. L.K. told Jacobs that when Jenkins was on top of her, he was "shoving his private" in her, which Jacobs asked L.K. to clarify. L.K. clarified that "his private" meant Jenkins's penis, and "in [her]" meant her vagina. L.K. further told Jacobs that Jenkins "was holding [her] down. When [she] tried to get up, he would force [her] where he wanted [her] to be." L.K. told Jacobs, "We [were] on the bed. I was just telling him to stop and I didn't want to do this. I was crying. And then after he ejaculated in my vagina, he stopped for like maybe two minutes and then he turned me around." L.K. explained to Jacobs that Jenkins was then "trying to force his penis in [her] butt but it didn't go all the way in. It didn't go in all the way. He wasn't deep. * * * Then he started ejaculating in [her] butt." L.K. told Jacobs that after that, Jenkins "got up walking around flipping out about stuff, about me cheating on him. That's when he got on top of me in the bed and started choking me." Jacobs clarified that "choking" meant that L.K. was on her back, and Jenkins "had both his hands around her neck facing her." L.K. told Jacobs, "the scary part was he was laughing during it."

{¶ 16} On cross-examination, Jacobs agreed that she did not observe any "signs of acute traumatic injury" when examining L.K. But Jacobs stated, "Lack of injury does not mean lack of assault." Jacobs agreed that (1) L.K.'s clothing that was

collected did not have any tears or holes, (2) L.K. told her that she felt safe at home, and (3) Jacobs wrote, "Unremarkable. No point tenderness[,]" when examining various parts of L.K.'s body during the examination.

{¶ 17} Salesha Baksh testified that she is a forensic DNA analyst at the Cuyahoga County Regional Forensic Laboratory. She tested samples taken from L.K.'s rape kit and compared them to Jenkins's buccal swab. Baksh testified that Jenkins's sperm was found on L.K.'s vaginal and anal swabs.

{¶ 18} The state rested. Jenkins moved for a Crim.R. 29(A) acquittal, which the trial court granted as to Count 3. The trial court denied Jenkins's motion with respect to Counts 1, 2 and 4. Jenkins did not present any witnesses on his behalf.

{¶ 19} The trial court found Jenkins guilty of Counts 1, 2, and 4. On Counts 1 and 2, the trial court sentenced Jenkins to a minimum of six years in prison for each offense and a maximum of nine years in prison, to run concurrently to each other and concurrent to 180 days in jail on Count 4. The trial court also notified Jenkins that he was classified as a Tier III sex offender and would be subject to a mandatory period of five years of postrelease control upon his release from prison. It is from this judgment that Jenkins now appeals.

## II. Reagan Tokes Act

{¶ 20} In his first assignment of error, Jenkins argues that Ohio Revised Code sentencing provisions as enacted by Am.Sub.S.B. No. 201, commonly known as the Reagan Tokes Act, are unconstitutional. He claims that the Reagan Tokes Act

violates (1) the constitutional right to a trial by jury, (2) the separation of powers doctrine, and (3) due process.

{¶ 21} Jenkins, however, did not object to his sentence or raise a constitutional challenge to the Reagan Tokes Act at his sentencing hearing. "It is well established that 'the question of the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court.'" *State v. Alexander*, 12th Dist. Butler No. CA2019-12-204, 2020-Ohio-3838, ¶ 8, quoting *State v. Buttery*, Slip Opinion No. 2020-Ohio-2998, ¶ 7.

{¶ 22} This court has recently declined to address constitutional challenges to the Reagan Tokes Act when defendants did not object to their sentences or otherwise raise the constitutionality of the act at their sentencing hearing. *See State v. Dames*, 8th Dist. Cuyahoga No. 109090, 2020-Ohio-4991, ¶ 12-19; *State v. Hollis*, 8th Dist. Cuyahoga No. 109092, 2020-Ohio-5258, ¶ 47-54; and *State v. Stone*, 8th Dist. Cuyahoga No. 109322, 2020-Ohio-5263, ¶ 6-10. We therefore decline to address Jenkins's constitutional arguments raised for the first time on appeal.

{¶ 23} Although this court has the discretion to review arguments that were not raised in the trial court for plain error, we decline to do so here. As we noted in *Dames*:

> Even if the appellant failed to object to the constitutionality of the statute at the trial-court level, appellate courts may still review a trial court decision for plain error. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. However, in order to review for plain error "we require a showing that there was an error, that the error was plain or obvious, that but for the error the outcome of the proceeding would have been otherwise, and that reversal must

be necessary to correct a manifest miscarriage of justice." Dames did not make any plain error showing for this court to review.

*Id.* at ¶ 14; *see also Hollis* at ¶ 50 ("Furthermore, like *Dames*, appellant failed to raise a plain error argument in this appeal, and we decline to construct a plain error argument on appellant's behalf."); *Stone* at ¶ 10 ("In addition to failing to raise a constitutional challenge of the Reagan Tokes Act in the trial court, Stone also has not argued plain error in this appeal. Consequently, we decline to address this issue for the first time on appeal.").

{¶ 24} Accordingly, Jenkins's first assignment of error is overruled.

## III. Manifest Weight of the Evidence

{¶ 25} In his second assignment of error, Jenkins contends that his convictions are against the manifest weight of the evidence.

{¶ 26} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955).

{¶ 27} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences,

consider the credibility of witnesses, and determine "'whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

{¶ 28} Jenkins maintains that the trial court's decision finding him guilty is against the manifest weight of the evidence because L.K.'s testimony is unreliable and uncorroborated. In support of this argument, he argues that (1) there was no physical evidence, including no photos of physical injuries or torn clothes, (2) there was no evidence that she yelled or screamed, (3) her children did not wake up during the encounters, and (4) L.K. was under pressure from the father of her youngest child to "kick Jenkins out of the house."

{¶ 29} After reviewing the record, we do not find that the trial court clearly lost its way in finding Jenkins guilty of rape and domestic violence. The fact that L.K. did not have any physical injuries or torn clothes does not mean that Jenkins did not rape and choke L.K. L.K. testified that she told Jenkins she did not want to have sex and to stop. The sexual assault nurse examiner testified that L.K. told her that Jenkins "was holding [her] down. When [she] tried to get up, he would force [her] where he wanted [her] to be." L.K. further told the nurse, "We [were] on the

bed.  I was just telling him to stop and I didn't want to do this.  I was crying."  L.K. also testified that she did not scream or yell because she did not want to wake up her children, two of whom were sleeping upstairs in bedrooms close to her bedroom. With respect to the father of L.K.'s youngest child, while L.K. agreed that her child's father did not like Jenkins living in her home, L.K. also stated that she was not lying about the rapes and choking "just to get [Jenkins] out of the house" to make her child's father happy.

{¶ 30} L.K. also testified that this was not the first time that Jenkins had raped her.  She explained that when he raped her in the past, she did not report it to police because she did not want to break up with him.  She said that she had just hoped he would not do it again.  L.K. stated that she called the police this time because she was scared that "one day it's going to be the day when I really don't make it," and she "just wanted [Jenkins] to get some help."  L.K. also testified that although she did not suffer any physical injuries, she had been experiencing anxiety since the incidents had occurred.

{¶ 31} After reviewing the entire record and weighing the evidence and all reasonable inferences, we find that the trial court did not clearly lose its way and create such a manifest miscarriage of justice that Jenkins's conviction must be reversed and a new trial ordered.  This is simply not the exceptional case where the evidence weighs heavily against the conviction.

{¶ 32} Jenkins's second assignment of error is overruled.

{¶ 33} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, ADMINISTRATIVE JUDGE

ANITA LASTER MAYS, J., and
MICHELLE J. SHEEHAN, J., CONCUR